# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
### AT    HUNTINGTON

MICHAEL L. PINKERMAN SR.
and LAURA J. PINKERMAN

                Plaintiff's

v.

Case No. 3:21-cv-00579

Jury Trial Demanded



CABELL COUNTY COMMISSION
CABELL COUNTY SHERIFF'S DEPARTMENT
SHERIFF CHARLES ZERKLE
LIEUTENANT MICHAEL ADKINS
LIEUTENANT DALE ENOCHS II
SARGEANT ROBERT MCQUAID - Retired
DEPUTY 1ST CLASS JARED CREMEANS
CORPORAL JAMES JOHNSTON
DEPUTY BRADY HINCHMAN
DEPUTY NATHANIEL RODGERS
SERGEANT STEVEN VINCENT
CORPORAL TERRY MCFANN II
DEPUTY HUNTER NEIL
CORPORAL MATTHEW SIEBEL
SERGEANT KEVIN WHITE
DEPUTY DAKOTA RENDER
DEPUTY JOSHUA PARSONS
DEPUTY 1ST CLASS PRESTON STEVENS
SARGEANT T.S. BLATT
WEST VIRGINIA STATE POLICE DEPARTMENT
FIRST SARGEANT G.N. LOSH
BARBOURSVILLE POLICE DEPARTMENT
BARBOURSVILLE POLICE CHIEF DARREN MCNEIL
UNNAMED AGENTS, OFFICERS, AND EMPLOYEES OF THE
        CABELL COUNTY SHERIFF'S OFFICE, BARBOURSVILLE POLICE
        DEPARTMENT AND WEST VRGINIA STATE POLICE DEPARTMENT
        INVOLVED IN THE OCTOBER 30, 2019 RAID, BEFORE AND AFTER AT
        4036 BLUE SULPHUR ROAD ONA, W.V. OR THOSE WHO CONTRIBUTED
        TO THE WRONGFUL DEATH OF
        MICHAEL L. PINKERMAN JR. in their individual capacities

                                Defendant(s)

1

## JURISDICTION

1.    This is an action pursuant to 42 U.S.C. § 1983 and § 1988, the Fourth and Fourteenth

Amendments to the United States Constitution; Jurisdiction is proper in this Honorable Court

pursuant to federal question jurisdiction, 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3)(4), and 28

U. S.C. § 1983.  Amendment to the United States Constitution, arises out of the Defendants'

use of excessive force and unreasonable search and seizure on the Plaintiffs. These laws cover

forms of police brutality such as excessive use of force, willful false arrest, false imprisonment,

fabrication of evidence, tampering with evidence, false accusations of a crime, among others on

October 30, 2019 in Cabell County, W.V., within the Southern District of West Virginia.

## VENUE

2.    Venue is proper in this Court under 28 U.S.C. § 1391(b) Defendants reside in this district

and all incidents, events, and occurrences giving rise to this action occurred in this district.

## PARTIES

3.    The Plaintiffs, Michael L. Pinkerman Sr., and Laura J. Pinkerman is now, and was at all

times relevant hereto, a resident of Cabell County, West Virginia.

4.    Defendant   CABELL COUNTY COMMISSION ("CCC") is a political subdivision of the

State of West Virginia, and as such, is liable for the negligent conduct of its agents and

employees, including the Sheriff, the Sheriffs Department, and the employees of the Sheriffs

Department, as well as the Prosecuting Attorney and the employees of the Prosecuting Attorney,

so long as that conduct was carried out within the scope of their employment. See West Virginia

Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1, et seq

5.    The conduct alleged herein to have been committed by employees and/or agents of

2

Defendant CCC are hereby alleged to have been committed by said agents and/or employees acting in the scope of their employment and authority. The causes of action asserted herein against Defendant CCC refer to acts performed by agents and employees of said Defendant political subdivision, rather than the formulation and implementation of policy related to how law enforcement and police protection are provided.

> Serve:    Kelli Sobonya, Commissioner, in her official capacity as Commissioner.
> Suite 300 - Courthouse
> 750 - 5th Avenue
> Huntington, West Virginia 25701-2072

> Serve:    Jim Morgan, Commissioner, in his official capacity as Commissioner.
> Suite 300 - Courthouse
> 750 - 5th Avenue
> Huntington, West Virginia 25701-2072

> Serve:    Nancy Cartmill, Commissioner, in her official capacity as Commissioner.
> Suite 300 - Courthouse
> 750 - 5th Avenue
> Huntington, West Virginia 25701-2072

6.    Defendant    CABELL COUNTY SHERIFFS DEPARTMENT

> Serve:    Cabell County Sheriff's Department
> c/o Charles Zerkle Jr.
> 750 - 5th Ave. Suite 101
> Huntington, WV 25701-2072

Defendant ("employing defendants") are agencies and/or political subdivisions of the State of West Virginia, or some other type of governmental entity, and are sued under State law claims.

7.    Defendant    SHERIFF CHARLES ZERKLE, in his individual capacity.
> c/o Cabell County Sheriffs Department
> 750 - 5th Ave. Suite 101
> Huntington, WV 25701-2072

In his official capacity as Sheriff of Cabell County, West Virginia is sued on the basis of the acts of officers, agents, and employees of the Cabell County Sheriff's Office, which were taken pursuant to official policy, practice, and/or custom. At all times relevant herein, the officers, deputies, employees and agents of Cabell County Sheriff's Office were acting under the color of law.

8.     Defendant     LIEUTENANT MICHAEL ADKINS, in his individual capacity.
                               c/o Cabell County Sheriffs Department
                                 750 - 5th Ave. Suite 101
                                 Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

9.     Defendant     LIEUTENANT DALE ENOCHS II, in his individual capacity.
                                 c/o Cabell County Sheriffs Department
                                 750 5th Ave. Suite 101
                                 Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

10.     Defendant     SARGEANT ROBERT MCQUAID, retired, in his individual capacity.
                                 144 Twp Rd 1389
                                 Chesapeake, Ohio 45619

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

11.     Defendant     CORPORAL TERRY D. MCFANN II, in his individual capacity.
                                 c/o Cabell County Sheriff's Department
                                 750 5th Ave. Suite 101
                                 Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

12.     Defendant     DEPUTY HUNTER NEIL, in his individual capacity.
                                 c/o Cabell County Sheriff's Department
                                 750 5th Ave. Suite 101
                                 Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

13.     Defendant     SERGEANT STEVEN VINCENT, in his individual capacity.
                                 c/o Cabell County Sheriff's Department
                                 750 5th Ave. Suite 101
                                 Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

14.   Defendant   CORPORAL JAMES JOHNSTON, in his individual capacity.
                  c/o Cabell County Sheriff's Department
                  750 5th Ave. Suite 101
                  Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

15.   Defendant   DEPUTY 1ST CLASS JARED CREMEANS, in his individual capacity.
                  c/o Cabell County Sheriff's Department
                  750 5th Ave. Suite 101
                  Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

16.   Defendant   DEPUTY BRADY HINCHMAN, in his individual capacity.
                  c/o Cabell County Sheriff's Department
                  750 5th Ave. Suite 101
                  Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

17.   Defendant   DEPUTY NATHANIEL RODGERS, in his individual capacity.
                  c/o Cabell County Sheriff's Department
                  750 5th Ave. Suite 101
                  Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

18.   Defendant   CORPORAL MATTHEW SIEBEL, in his individual capacity.
                  c/o Cabell County Sheriff's Department
                  750 5th Ave. Suite 101
                  Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's Department and was at all times relevant hereto acting under the color of law.

19.   Defendant   DEPUTY DAKOTA RENDER, in his individual capacity.
c/o Cabell County Sheriff's Department
750 5th Ave. Suite 101
Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's
Department and was at all times relevant hereto acting under the color of law.

20. Defendant   SERGEANT KEVIN WHITE, in his individual capacity.
c/o Cabell County Sheriff's Department
750 5th Ave. Suite 101
Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's
Department and was at all times relevant hereto acting under the color of law.

21.   Defendant   DEPUTY JOSHUA PARSONS, in his individual capacity.
c/o Cabell County Sheriff's Department
750 5th Ave. Suite 101
Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's
Department and was at all times relevant hereto acting under the color of law.

22.   Defendant   DEPUTY 1ST CLASS PRESTON STEVENS, in his individual capacity.
c/o Cabell County Sheriff's Department
750 5th Ave. Suite 101
Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's
Department and was at all times relevant hereto acting under the color of law.

23.   Defendant   CORPORAL T. S. BLATT, in his individual capacity.
c/o Cabell County Sheriff's Department
750 5th Ave. Suite 101
Huntington, WV 25701-2072

Defendant was at all times relevant hereto a police officer with the Cabell County Sheriff's
Department and was at all times relevant hereto acting under the color of law.

24.   Defendant   WEST VIRGINIA STATE POLICE ("WVSP")
3339 U.S. Route 60 East
Huntington, WV 25705-2838

Defendant ("employing defendant") is an agency of the State of West Virginia tasked with the mission of statewide enforcement of criminal and traffic laws, and are sued under State law claims.

25.    Defendant    FIRST SARGEANT G.N. LOSH, in his individual capacity.
                    c/o West Virginia State Police Department
                    3339 U.S. Route 60 East
                    Huntington, WV 25705-2838

Defendant was at all times relevant to a police officer with the WVSP stationed in Cabell County, WV and was at all times relevant hereto acting under the color of law.

26.    Defendant    BARBOURSVILLE POLICE DEPARTMENT
                    815 Main St.
                    Barboursville, WV 25504-

Defendant ("employing defendants") are agencies and/or political subdivisions of the State of West Virginia, or some other type of governmental entity, and are sued under State Law claims.

27.    Defendant    CHIEF DARREN MCNEIL, in his individual capacity.
                    c/o Barboursville Police Department
                    815 Main Street
                    Barboursville, WV 25504 -

Defendant was at all times relevant hereto the Chief of Police of the Barboursville Police Department and was at all times relevant hereto acting under the color of law.

28.    UNNAMED AGENTS, OFFICERS, AND EMPLOYEES OF THE
            CABELL COUNTY SHERIFF'S OFFICE, THE BARBOURSVILLE POLICE
            DEPARTMENT, THE WEST VIRGINIA STATE POLICE DEPARTMENT AND
            ALL INVOLVED IN THE OCTOBER 30, 2019 RAID BEFORE, AFTER AND
            THOSE INVOLVED IN THE INVESTIGATION OF THE OFFICER
            INVOLVED SHOOTING AT 4036 BLUE SULPHUR ROAD ONA, W.V. AND
            THOSE WHO CONTRIBUTED TO DETAINING, ARRESTING, CHARGING,
            OR PROSECUTING OF MICHAEL L. PINKERMAN SR.
                                        in their individual capacities.

                                        Defendant(s)

## **COMPLAINT**

29.    On 10/30/2019 18:33:48 (6:33:48 pm.) CAD Call Number 193030280 Incident Report

received from the Cabell County Emergency Rescue Center (CCERC) 911Call Center. There

7

were (3 John Doe) West Virginia State Police (WVSP) Tactical Team Members positioned 25

feet apart in front of 4036 Blue Sulphur Road in Ona, stopping and clearing all traffic from the

area. There were (13) Cabell County Sheriff Deputies. (2) inserted 10 minutes prior, Defendant

D# 11 Cpl. Terry D. McFann, assigned as the Team "Sniper" and D# 12 Deputy Hunter Neil

assigned "lookout for the Sniper"

30.      There were (10) Cabell County Sheriff Department (CCSD) Deputies surrounding the

Pinkerman residence to execute a misdemeanor Search Warrant a (10-100). D# 13 Sgt. Steven

Vincent, he's standing on the right of the back kitchen door. He's the man giving orders. D# 14

Cpl. James Johnston, Door Ram. D# 15 Dfc. Jared Cremeans, #1 in Stack . D# 16 Deputy Brady

Hinchman, #2 in Stack, D# 17 Deputy Nate Rodgers, #3 in Stack. D# 18 Cpl. Matthew Siebel,

D# 19 Dakota Render, D# 20 Sgt. Kevin White stated he was #7 in stack and D# 21 Joshua

Parsons. D# 22 Sgt. Preston Stevens made the scene after the back kitchen door shooting.

31.      LAURA - October 30th, 2019 started like any other day. Big Michael and I left the

house about 9 am. We're going to the Hermitage of the Holy Cross Monastery in Wayne WV.

We left the Monastery around 3:20 pm. that day and it takes about 45 minutes to get home. I was

in the kitchen making Chicken n Dumplins. Our dog Annie was at my feet. I had just served

myself a bowl and was headed to the living room. My husband Michael Sr. was in the Bathroom

cleaning up before dinner. As I walked by the bathroom door I said, "Dinners ready and waiting

in the kitchen." I then set my food down on the end table in the Living room and was headed to

Michael Jr's. bedroom door to let him know dinner was ready.

32.      But something caught my attention down on the road. I look out of our 4' x 6' front

living room window. The road is about 100 ft. from our house. I see three (3) Blue SUV

vehicles spaced roughly 25 feet apart, passenger side doors facing our house, with small red

lights flashing in the back windows. Michael Sr. is still in the Bathroom. I said, "Michael,

something's happened down on the road." Michael Sr. said, What is it? I look at the SUV

in the middle and see someone bent down at the front drivers side tire and I'm thinking

"Aww...Did the neighbors dog get hit? Or was there an accident?" I lean over the couch which

is under the window to get a better look of the vehicle on the right. In front of that vehicle

was a man, standing in a military type clothing in an at-ease stance, he has a rifle across his

chest and he's looking directly at our house. I then tell Michael Sr., "I think it's the po."

33.     Before I can finish my sentence I hear 5-6 loud pounding thuds at the back kitchen

door. (Like someone using their fist or their foot and hitting on the back kitchen door as hard as

they can.) Our back kitchen door is a left handed 36" metal full glass patio door with a pvc grid

on both sides of the glass, There was no window blinds or sheers, it had a full view inside and

out. The door opens into the kitchen and it is mounted on the exterior of our painted 8 inch block

home. That means there's 4 inches of solid wood that the door cylinder and dead bolt cylinder

would have to bust through for the door to open and that just wasn't going to happen.

34.     Our dog Annie (mid sized, black with white chest, part Border Collie/German

Sheppard) beats me to the back kitchen door. When I get to the door, there were 5-6 men

pointing assorted firearms at me! All of them Yelling! "Open the door! Open the door!

I'm thinking these guys are at the wrong house! (our mailbox number are out of sync) Annie

is at the door barking, the first thing I can think to do, for their safety as well as hers, is to get

Annie into the bedroom, it's not 12 feet away. As I grab Annie by the collar, I'm informing the

man on the right side of the door, <u>D# 13 Sgt. S. Vincent</u>, "I'm putting my dog up! It won't take a

sec!" I know Big Michael is right behind me, he can handle this. I get 2 steps away," I hear a

man say, "Don't worry about the fuckin dog!" Annie's resisting me wanting to get back to the

door. Her collar slips off. I pause just long enough to slip her collar back over her head.

35.     I glance up and see Cpl. Johnston lift up a door ram. He's standing in the middle of the

door but slightly behind Dfc. Cremeans who is on my left, standing beside the 6' x 12' wall of

stacked firewood and Sgt. Vincent who is standing on the right side of the door is standing

beside a wall cabinet and kindling box. Cpl. Johnston has to reach between them, over their

shoulders, using the door ram he hits the upper part of the back kitchen door. Glass is going

everywhere! Shocked! I yell, "Stop! What are you doing?"

36.     At that same time Michael Sr. is coming into the kitchen from the Bathroom. All

the men are still yelling "Open the Door! Open the Door!" I'm holding Annie by the Collar

and have to step back out of Michael Sr's. way as he is going by me to address what is

happening at our back kitchen door. I watch as Michael Sr. follows the commands that Sgt.

Vincent is giving him and I see Michael Sr. struggling to open the door.

37.     With all the yelling, confusion and chaos at the back kitchen door, I see our son,

Michael rush into the kitchen from his bedroom. He stops on the right side of his father.

1 second later I heard a man outside say "Gun!" I'm expecting the same man to say Police!

Drop your Weapon! No, Not 1 second later, gunfire is pounding into our home! As I'm

looking at Michael's Jr's face as I see him blink as wood, drywall particles, plastic and glass

are blowing into the kitchen. It's like someone turned on a fan in a construction site. I see

Michael Jr. leaving the back kitchen door just as quick as he came in. I didn't see a gun when

he came in the room. I couldn't see if he had a gun when he was standing beside his father and I

didn't see a gun when he left the room.

38.    Big Michael jumped back to his right, he's pushing me back. I'm thinking, "I'm going to Die today!" I'm falling backwards onto the floor. I no longer have Annie by her collar. My worst fear, my son is dead! The firing stops and my husband has stooped down in front of the kitchen sink. I see blood on the floor in front of him. His right hand is bleeding. He get's up and yells, I've been Hit! Again the men saying "Open the door!" Big Michael finally gets the door open and he steps outside.

39.    I'm sitting on the floor in front of the Refrigerator. Annie is now back with me shaking. I see blood streaming down my kitchen wall. Large amounts of blood splatter on the floor going into the dining room toward Lil Michaels bedroom. I start screaming for my son, Michael! Michael! Talk to me! Then I start yelling at the men outside. "Why are you doing this? Why are you shooting my son?   Michael! Michael! Please talk to me? I am getting no answer. I can't see him. I want to go to him. My son needs me, he needs help!

40.    What the hell just happened here? One of the men is telling me to come outside. I don't want them to start shooting again. I don't want to get shot. So, I tell them, "I'm getting the dog." She is with me, shaking, traumatized just as much as I am. Again one of them says, "Don't worry about the fuckin dog!" I picked her up so she doesn't get hurt due to all the glass on the kitchen floor and proceeded to go outside. There are (3) men with firearms standing right outside the back kitchen door. I heard the man who was standing behind the 2 in front of him say, "What do we do next Flash Bangs? I know what flash bangs are and what they are used for but I've never seen them or heard what they sound like. As I walked past them I asked, "Why are you shooting my son?" Big Michael is standing on the passengers side of the truck, In hand cuffs?

11

41.    MICHAEL - On October 30, 2019 my wife Laura and I came home a little early from the Hermitage of the Holy Cross Monastery in Wayne W.V. I took my dog Annie out to go to the bathroom and get some exercise then came back inside, went by Michael's room, told him we were home. He didn't answer me so I peeked in his room, Michael was asleep in his bed, his room was dark, the blinds were closed and curtains are drawn. I gently closed the door then Annie and I went to the couch to watch some TV. Laura was fixing dinner so I decided to go to the bathroom, clean up and get ready to eat.

42.    While in the bathroom I hear Laura say to me, "something has happened down on the road." I asked her, "what's going on?" I immediately hear loud pounding at the back kitchen door. The whole house is vibrating, hurrying up to finish I rush toward the Kitchen by way of our Bedroom. Before I step foot in the kitchen, Glass is going everywhere! Laura has Annie by her collar, her right hand shielding her face from the flying glass, she's yelling at someone outside the door. I hear people yelling, all at the same time, yelling the same thing over and over, "Open the door!" Open the door! I get 2 steps into the kitchen and I see a man outside standing against the right side of the back kitchen door. At the time I didn't know who these people were or what they wanted.

43.    I now know that this man is a CCSD Deputy <u>D# 12 Sgt. Steven Vincent.</u> He's aiming a Firearm at me. Sgt. Vincent is yelling, "Are you armed? Show me your hands!" I said, No, I'm not armed, showing him both my hands. I stop several feet from the door. He's less than (4) four feet away. I'm trying to keep some distance between us. His gun is pointed at my head. I know this is serious and I follow every command. I have no idea what's going on or why they are here. I ask, "Who are you? What do you want? Someone else outside yells, "Don't fucking

worry about it! Open the door!"

44.       Sgt. Vincent orders me to get on the floor. Keeping my hands on the kitchen

Countertop I proceed to get down on the floor, Before my second knee hit's the floor. Sgt.

Vincent realizes that if I'm on the floor who's going to open the door. Sgt. Vincent then starts

shouting what everyone else is shouting, "Open the door! Open the door!" I quickly get back up,

reach across the kitchen counter top to open the door, again trying to keep some distance

between myself and Sgt. Vincent's firearm.

45.       We are not able to just talk to each other, due to the men outside shouting all at the

same time. I can't get the door to open! The door knob will not turn, the door lock will not turn,

the dead bolt latch will not turn to unlock the door. I'm thinking, "What is wrong with this

door?" I have to shout back so that Sgt. Vincent can hear me. "The door won't open!" I can't

get the door to open! Again Sgt. Vincent has a firearm aimed at my head. I'm trying to keep my

distance from him. I'm in fear for our lives. Sgt. Vincent shouts, Pull harder! I now have to get

closer to him and position myself in front of the door. I now see more men and more firearms

pointed at me. Their fingers on the triggers. I continue to try to get this door open as I'm

shouting at them telling them the door is not opening! Someone outside shouts, "Is Michael

Here?" I said "Yes" immediately Sgt. Vincent says, "come through then door!" (?)

46.       As I am still struggling with the door, out of my peripheral vision I see my son

Michael rushing into the kitchen, he's beside me. He was in his bedroom asleep, the commotion

and shouting at the back kitchen door must have awakened him. He's barefoot and in his

underwear, stepping and sliding on glass his hands come up as if to steady himself. Without

warning the men outside open fire! Frightened, I jump back towards my left, pushing my wife

out of harms way. I'm looking directly at my son. I don't see a gun in his hands. I see bullets going into his body as he's leaving the room. He wasn't there 2 seconds. He's going back towards his bedroom, I see Blood squirting from his body. Again I see both of Michaels Jr's. hands and I don't see a firearm. As Michael Jr. is going by the dining room table, he turns slightly to his right, looking back at me, the look of shock on his face. Not knowing this was the last time I would see my son alive but the last time I would ever see him again.

47.     The men outside have stopped shooting. I've stooped down in front of the kitchen sink for cover. My right hand is bleeding. I need to get help for my son. My wife Laura is now sitting on the floor in front of the Refrigerator. She's in shock. I quickly stand up and shout out "I'm Hit" I'm afraid they will start shooting again. They begin shouting "Open the door!" I've got to get this door open. I grab a hold of the door where the glass used to be and the door knob and pull with everything I've got! I twist the door forcing the deadbolt and door cylinder sideways, finally the door is open. I step outside the door holding my injured right hand. Sgt. Vincent walks up to me and takes my right arm and leads me across the front of my truck to the passengers side of my truck. My son needs help, why are you here? Why are you shooting? Who's paying for this damage?

48.     D# 17 Deputy Nate Rodgers begins assaulting me, using his knee, he hits the side of my knee twice, puts a hand cuff on the right wrist first then my left wrist. After I'm hand cuffed he takes my right arm and twist it, then forcefully jacks up my right shoulder, pushes it up to the point that I hear what sounds like glass breaking. As he's whispering in my ear, "Stop resisting or you're a dead man." I wasn't resisting, he never told me he needed to handcuff me. My concern is for my son. When Deputy Hunter Neil "lookout man" walks up. I tell them, "I

14

think I've been shot, my side hurts." They looked but said they didn't see anything. Laura has come out of the house, she's carrying Annie. For Annie's safety we lock her in my truck.

49.      We are handed over to <u>D# 12 Deputy Hunter Neil</u> and led away from our house. We see <u>D# 11 Sgt. Terry D McFann II</u> designated "Sniper" rifle in hand, laying on the ground beside of our Water Maple tree by our driveway. As we are walking towards our neighbors driveway I see men at the side dining room door of our home. I see them breaking the dining room storm door glass and the dining room window glass. Then my vision is blocked by my neighbors house. 2 seconds later I hear more gunfire. I look at my Wife saying "They just Murdered our son!"

50.      As Deputy Neil is leading us around to the open back doors of a Black van, I take several steps forward and look around the front of my neighbors house. In our front yard we see a Cabell County Sheriff pickup truck backed up to my sons front bedroom window. It's either <u>D# 22 Sgt. Preston Stevens or D# 28 Deputy John Doe</u> and they're standing in the bed of a pickup truck pointing a Rifle at my son's front bedroom window. There are Police cars as far as the eye can see. I've tried to get information from someone, both police officers that I recognized and ones I don't. I keep asking "What's going on here, just to be passed by and ignored.

51.      My hand is bleeding and the handcuffs are too tight. I ask Deputy Neil to loosen them but he is more concerned that I would hurt him. I informed Deputy Neil that if I wanted to hurt him that these handcuffs wouldn't stop me from doing that. I tell him I'm not going to hurt him, I stated I knew where he lived. I again tell him the handcuffs are too tight, my hand is bleeding and my side is still hurting, I know I've been shot. Then Deputy Neil leads us to a ambulance to have me looked at. I am advised by the Ambulance Medic that I have a deep graze wound that

15

needs to be addressed. They recommend that I go to the hospital. Knowing about my wounds, I advise them that I will be OK, I'll address the wounds myself. My only concern is my son.

52.       Four (4) Men are walking by, I recognize one of them only by the name of "Rooster", his name is D# 27 Chief Darren McNeil, from the Barboursville Police Department. He was also one of the 4 officers that helped with get Michael Jr. Fired from his job at the CCERC on May 9, 2019. Then D# 7 Sheriff Charles Zerkle, with his #1 and #2 man. I try to stop Chief McNeil before he gets by us, not realizing at the time they were coming to see us. I said to him, "I don't want to hear any bull shit, is my son dead or alive. He looks at me with a tear in his eye and he says, "Your son is no longer with us." I said, "You Son of a Bitches! This was uncalled for!" My wife starts slapping herself. She as I can't believe this is happening to us. My attention then goes to my wife. All I could do was hold her. Chief McNeil keeps telling me that we need to go to the hospital. So we leave in the Ambulance.

53.       Laura and I are escorted by Deputy Neil to Cabell Huntington Hospital. While in the ER (3) men in plain clothes approach us and inform us that they are from the WV State Police Department and they will be conducting the Investigation of the shooting. 1st Sgt. A. S Pardue said he in was in charge of the Investigation, with Sgt. S. M. Boyles and Lt. D. J. Chapman. When 1st Sgt. Pardue asked his first question he realized we both were there and witnesses. Then separated us to get our statements. I stay in the ER Room and my wife Laura, the ER Chaplain and Sgt. S. M. Boyles leave and go somewhere else in the hospital.

54.       I felt that I had to give this statement to the WV State Police. I was given the impression that I had no choice, only to find out later I didn't have to. F/ Sgt. A. S Pardue, wanted a statement as to what had happened at our home tonight. F/Sgt. Pardue asked me if the

gunfire was coming in and going out. I told him, all the gunfire was coming into the house. I told

him it was just like Bonnie and Clyde that there were (8) eight or more men outside my door in

costumes with Deadly weapons. I told him about not being able to open the door. I told him that

Michael Jr. was asleep in his room, probably heard the commotion and rushed in to help. They

keep asking me if Michael Jr. had a gun. At this time I told them that if something like this is

happening at a back door we usually come prepared. F/Sgt. A.S. Pardue was asking questions

that I really couldn't answer. I had not been able to process what had happened myself. As I am

talking to F/Sgt. Pardue I can tell by his body language and facial expressions that he didn't like

what I had to say. The other Officer Lt. D. J.Chapman showed no emotion when listening to my

statement. Soon after that my wife Laura, My Brother David and his wife Cindy came into my

room. I was discharged and was getting dressed only to find out I was being arrested.

55.      Four Cabell County Sheriff Deputies arrested me, handcuffed me and took me to the

Cabell County Courthouse. I was finger printed. Then I was taken out in the hallway and sat

down on a bench in front of the Magistrates office. D# 10 Sgt. RH McQuaid went in and talked

to Magistrate Daniel. M. Goheen and then they would both look at me and continue to talk. Sgt.

McQuaid walked back into the Magistrate Goheen office. Then after the paperwork is done.

They start telling me what they were charging me with. I really didn't understand why I was

being charged much less what I was being charged with. I was just numb. My Son is gone!

Is my wife and Annie OK. I was later transported to the Western Regional Jail.

Although Michael Jr's life tragically ended that evening, Michael Sr's. nightmare had just begun.

Cabell County Sheriff's Dfc. Jared Cremeans and Sgt. R.H. McQuaid have abused their powers

and fabricated evidence to create false Criminal Complaints in the Magistrate Court of Cabell

County. West Virginia against both Michael L. Pinkerman Jr. which caused his Death and now

False accusations and charges have now been charged to his father Michael L. Pinkerman Sr.

56.    This is the 1st Fraudulent Criminal Complaint that Sgt. R.H. McQuaid filed.

State of West Virginia v. Michael L. Pinkerman Case# 19M06F00814 61-11-8 FELONY
OFFENSE OF ATTEMPTED TO COMMIT A FELONY, FIRST DEGREE MURDER, BY
ACTING AS AN ACCESSORY BEFORE THE FACT X2

I further state that this complaint is based on the following facts:

On October 30, 2019 at approximately 6:33 pm., at (4306) Blue Sulphur
Road Ona WV 25545. The suspect encountered deputies from the Cabell
County Sheriff's Office who were attempting to serve a search warrant at that
location regarding a stolen firearm that his son (Michael L. Pinkerman II)
had in his possession earlier on this date. After Identifying themselves and
repeatedly advising the suspect to open the door of the residence pursuant to
a search warrant, the suspect braced himself against the door. As the deputies
continued to advise the suspect to open the door, he was observed having some
kind of communication with his son, Michael lane Pinkerman II (the offender
who had an arrest warrant against him for a prior listed crime).

As the door was breached the suspect forcibly closed the door, again while
having verbal communication with his son. As the door was forced open again,
gunfire from within the residence began and two deputies were struck multiple
times. The suspect was still actively blocking / attempting to block entry into
The residence before being forcefully removed from the residence. Deputies
Maintained their positions for a brief period before successfully entering the
residence. The actions of the father, Michael Lane Pinkerman allowed the
original suspect of the warrant to attempt to commit murder against Corporal
James Johnston, by shooting him multiple times.

Then there is a 2nd Fraudulent Criminal Complaint that Sgt. R.H. McQuaid filed against me for
the shooting of Dfc. Jared Cremeans. Nothing but lies here, How do you sleep at night?

## ILLEGAL ENTRY OF MY SAFES - PART 1

57.    Sgt. McQuaid received a phone call and came to me and gave me his phone. It was

CCSD D# 22 Cpl. T.S. Blatt asking for my Safe combinations. I asked him why he needed to

open my safes, all there is are some hunting guns. He stated that they needed to make sure there

18

were no Bombs in the house. I laughed and said, "Bombs? There's no Bombs in my safes, just Hunting Rifles. I told him I had to have my hands on the Safe Dials, it helps me remember the numbers. The older safe is complicated to get into. I didn't give anyone permission to get into my Safes. Less that 5 minutes later Cpl. Blatt called me again on Sgt. McQuaid's cell phone. This time Sgt. McQuaid went to hand it to me but then didn't want me to touch his phone. He developed an attitude with me. So he put it on speaker phone and held it himself. Cpl. Blatt said, "We are going to give you another chance to give us the combinations to open these safes. I advised him again I couldn't help him. Cpl. Blatt then asked me, "Where are the handles to the two Safes. I told him they were in the bedroom in the top drawer. I told him we didn't get in them very often. Cpl. Blatt then said, "If you're going to be that way about it, we'll find a way to get in them.

58.    LAURA: On 10/31/2019 at 7:17 pm D# 23 Cpl. T.S. Blatt called from 304-939-2188 he told me 2 of the safes were left open by us and legally he was able to access them. Cpl. Blatt said, "Your son must have accessed them when Deputies were here Wednesday evening to issue a Search Warrant. He want to know if I knew the combinations to the Safe behind the Dining Room door. I told him we do not leave our Safes open and Michael Jr. does not have access to them. As far as needing Combinations, I told him he needed to speak with Michael Sr. and he was in jail. Cpl. Blatt stated, "Yeah, he should have made better decisions. (?) He said he will try to speak with Michael Sr. but he will go as far as removing the Hall Safe from the home.

**ILLEGAL ENTRY OF MY SAFES - PART 2**

59.    On October 31, 2019 at 7:45 pm CCSD D# 23 Cpl. T.S. Blatt resorted to Perjury and Falsified government documents to get what he wanted. This doesn't surprise me. Cpl. Blatt

gave false information to Magistrate D.M. Goheen and based on this false information was granted a search warrant to illegally have a antique safe with precious antique bibles and blown glass items crafted by Michael Pinkermans great grandfather removed from our home.

60.     The Crime scene was released to D# 8 Lt. Michael Adkins on 10/31/2019 at 7:55 pm. By WVSP Cpl. J.D. Matheny. The contents of the Search Warrant state that Lt. Adkins located 3 stolen firearms in a unlocked safe on 10/31/2019. According to the NCIC Report these (3) Firearms were stolen in a robbery that happened back on November 8, 1996. In that report other Firearms were stolen and that gave the CCSD probable cause to access the Hall Safe in the Dining Room that was an antique that they (either the WVSP or the CCSD) could not open like the did the other 2 Safes in the house. My other 2 safes were newer models and their serial numbers were found on the back of each safe.

61.     On 10/31/2019 at 20:09:01 (8:09:01 pm.) Deputy Jason Howerton requested 911 to Dispatch A1 Wrecker to start this way. A1 Wrecker backs up to our side dining room door, wraps a cable around the large safe and forces the safe through whats left of our dining room door frame. The safe is at A1 Wrecker's garage, Lt. Adkins gets a search warrant to open the safe. A company is called and the combination was drilled through. No other Stolen firearms were found. On 11/29/2019 The Hall Safe was destroyed in a fire at A1 Wrecker.

### (3) ALLEGEDLY STOLEN FIREARMS

62.     Lt. Michael Adkins illegally found (3) allegedly stolen firearms in our locked safe, after illegally entering the safes. Then using falsified information on a government document, unknowingly or knowingly, Magistrate Goheen granted yet another search warrant giving the Sheriff deputies access to a 3rd safe. Now we have another illegal Criminal Complaint.

11/06/2019 - Criminal Complaint - State of West Virginia v. Michael Lane Pinkerman

Case# 19M06M05644 written by Sgt. R. H. McQuaid

Granted by Magistrate Michael McCarthy.

(3) Stolen guns, Receiving and Transferring stolen goods x 3 equals a $20,000 Bond.

A Warrant for my Arrest, if Guilty up to 1 yr and or $2500.00 x 3.

63.    These Allegedly stolen firearms belong to Joseph Hinchman. I was friends with Joe

in High School. Joseph Hinchman and D#13 Deputy Brady Hinchman are related!    Is this what

Cpl. Blatt meant when he said they would find a way to get in my safes? On 11/14/2019 these

CHARGES were DISMISSED By Magistrate Michael Woelfel, with no explanation given.

## A STOLEN BERETTA 9MM?

64.    On 10/30/2019 at 1:13 pm. In a recorded 4 minute 23 second Audio Recording D# 22

Sgt. Preston Stevens is speaking with a 911 operator "John Doe" to run a NCIC check using the

pictures illegally taken by D# 15 Dfc. Jared Cremeans of Michael Jr's. Beretta. Sgt. Stevens is

giving the 911 operator the ASSY number that is on the side of the Firearm. Both Dfc. Cremeans

and Sgt. Preston do not know what the ASSY means but assume it is the Firearms Serial #. The

911 operators finds a Beretta 9mm that is listed as stolen in his NCIC Database Check. There

was also a Beretta .45 caliber listed with the same ASSY #, Several times in the conversation it is

stated that the Firearm is a "Hit" and several times in the Conversation they are trying to confirm

the Model Number. This is when both the 911 Operator and Sgt. Stevens realize the firearm in

question needs to be in hand to verify both Serial and Model numbers in order for the firearm to

be confirmed as an actual Stolen Firearm or "Hit".

21

## THE SEARCH WARRANT

65.    10/30/2019 at 4:07 pm. IS ILLEGAL: The 911 Call Center sends a fax to the Ona

Field Office with the information previously requested by Sgt. Stevens from the previous

conversation they had earlier that day. This Fax has 2 Beretta's listed on it. A Beretta 9mm and a

Beretta .45 caliber both listed as Stolen on 09/06/2019. The Beretta .45 caliber had an x marked

across it as not to confuse anyone when they read the report. Both reported by Gilbert Police

Department in Gilbert Arizona. Both have the exact same Serial "ASSY" number. But different

Model numbers. Anyone could have read that report and knew something wasn't right about it.

Dfc. Jared Cremeans used the NCIC Stolen Beretta "unconfirmed hit" information he received

from the 911 operator.

66.    In his Affidavit he wrote, "Since the Affidavit is being submitted for the limited

purpose of obtaining a search warrant for a stolen gun at Mr. Pinkerman's residence it is

not intended to include each and every fact and matter observed by me or other investigators.

I have set forth those facts necessary to support probable cause for this application. Dfc.

Cremeans was granted this Search Warrant by Magistrate D.M.Goheen. 10/30/2019 at 4:50 pm.

with lack of evidence to support the Stolen gun in his Affidavit. No one researched or verified

this information. The Search Warrant is illegal because the supporting affidavit from Deputy

Cremeans contains false representations which were either intentional or made with reckless

disregard for the truth.

67.    When we received a small portion of the States Disclosure on 01/15/2020, in it was a

copy of a "Stolen Firearm" (a Beretta 9mm out of Gilbert Arizona.) This IS NOT Michael Jr's

Beretta Firearm. MICHAEL JR'S FIREARM IS NOT STOLEN. A Law Enforcement Officer

from the Gilbert Arizona Police Department entered into the NCIC Database a Beretta 9mm

Firearm and a Beretta .45 Caliber as stolen using the ASSY # 9346487-65490 which is engraved

on the Barrel of the Firearm. This ASSY# is literally on thousands of Beretta Firearms. The

ASSY # is a part# and a Government CASE code #. It is not a Serial #. These 2 Firearms don't

exist according to BERETTA USA Customer Service. The CCSD took it upon themselves to

Accuse, Convicted, and then Sentenced Michael Jr. to Death without Due Process.

### FAKE STOLEN BERETTA RECOVERED IN WA. - 911 CAD

68.     Call Information Transcript on 10/31/2019 at 6:22:36 SP581 Shawn Rohrbaugh either

ran a check on the fake stolen Beretta M9 SER/65490 / ENTERED AS RECOVERED GUN

OUT OF WA ? Then another entry at 15:50:12 BERETTA 9MM MODEL J92M - NIC

G944790100. SP581 Shawn Rohrbaugh works out of the Moorefield Detachment in Hardy

County, in the Eastern Panhandle of WV. He is also Facebook friends with F/Sgt. G.N. Losh.

### ILLEGAL SEARCH WARRANTS AND CRIMINAL COMPLAINTS

69.     Every single Search Warrant and Criminal complaint that was granted was obtained

illegally. Dfc. J. Cremeans, Sgt. R. McQuaid did it multiple times, Lt. Michael Adkins and Cpl.

T. S. Blatt. All have abused the powers given them. False information and Perjury was used to

obtain these Search Warrants granted by both Magistrates and Judges upon request. Granted

without seeing evidence, without question or regard as to how they were executed. These

illegally obtained Search Warrants were used to obtain the legal power to hunt down Michael Jr.,

Terminate him with no regard to human life and destroy the Pinkerman Family.

### FAKE BOMB THREAT

70.     10/30/2019 While at the Ambulance Michael Sr. was having his wounds assessed,

we were met by Barboursville Police D# 26 Chief Darren McNeil, Sheriff Charles Zerkle and (2)

CCSD John Does. Chief McNeil volunteered himself to Sheriff Zerkle to be the deliverer of bad

news, that our son was no longer with us. After a brief conversation with him about Michael

Sr's. wounds, going to the ER and leaving Annie in the Truck. After we had left in the

ambulance. Barboursville Police Chief D# 26 Darren McNeil created a Bomb Threat. We found

this out when we received the States Disclosure on January 15, 2020. This wasn't mentioned in

the Media or Newspapers. Cpl. T.S. Blatt did bring this up when he was wanting to get into the

safes. But we didn't know at that time about this Fake Bomb Threat. We feel the Bomb Threat

was a way to get time for Sheriff Zerkle to see just how bad his deputies messed up or to find a

way to get into our safes fishing for evidence to justify there Horrendous actions here.

### USING the MEDIA to COVER UP your CRIMES

71.     Cabell County Sheriff Charles Zerkle issued 3 statements to the media over the

next 2 days WSAZ, Facebook, WCHS, Metro News, Herald-Dispatch and all their affiliates.

Metro News alone has 1 million weekly listeners and Sheriff Zerkle is making Ridiculous False

Statements. 1st Interview, "WCHS-WVAH Facebook Live "Claimed that Michael Pinkerman Jr.

was Terminated in the entry" Sheriff Zerkle used the word Terminated, like Michael Jr. was one

of the 10 most wanted. Sheriff Zerkle justified the Murder of our son by turning him into a

Terrorist. Statements like, "The escalation of threats and violence on police officers as you

have seen is Nationwide, just continues to escalate."

72.     In Sheriff Zerkle's 2nd Interview with Metro News, Radio Host "HOPPY" asked,

"Then Michael Jr. was shot and killed by officers, what about Michael Sr.?   Zerkle's reply,

"Michael Sr., you know his son came in from behind him and tried to used him as cover, but our

Deputies shot him once in the hand and a wound in the hip. But a, he wasn't fatally shot."

You got to be kidding me! Michael loves his father and would never do that to him or me.

73.     Then on his 3rd interview on WSAZ Facebook with 367,817 views. at 4:08 minutes

into that video Sheriff Zerkle says, "I think they were kind a thinking maybe we were coming

back. I think they were ready and a, prepared and a, obstructed us, and a it didn't go well." then

4:43 minutes he says, "If they come, we're going to do something and a lot of people say that but

not very many people actually back that up." First of all, Michael was the only one here at the

12:10 pm. so called "Welfare Check" Yes, it states that Michael was mad and he cursed, but if

Threats were made it should have been addressed at that time and Michael should have been

arrested. Nothing like that was written in the 10/30/2019 4:50 pm. Search Warrant Statement of

Facts. Michael complied with every order given him. If he got mad it was because his Civil

rights were being violated and as an American Citizen we have that right.

74.     This is where Sheriff Zerkle told on himself. 17:34 minutes into the Video Zerkle

Stated, "once you commit there's no going back. You commit to go, you gotta go and everybody

in the stack knows you gotta go, and you just, you go and you don't go till the threat is taken care

of, and that's, that's what happened. Sometimes they surrender, sometimes they don't.

Ultimately the best situation is they surrender. This paragraph tells me, what I already know.

What was executed at our home was a Deadly No Knock Raid.

75.     19:34 minutes into the Video, Sheriff Zerkle says, I've done this job for 30 years,

everyday. Sheriff Zerkle knew his Deputies were executing a deadly No Knock Warrant that day,

he was in route before it happened. But Sheriff Zerkle, you should know how to read a NCIC

report. Where was your 30 years of experience.

76.    At 21:10 minutes into the video, Zerkle is almost crying. He says, Hey Listen, these young guys are like my kids, ya know so, you don't want to lose one of them. That's for sure. Sheriff Zerkle my son is DEAD! Because of your kids and their lack of Judgement and Training. How many other people have your kids hurt or killed due to their lack of training. You say you train everyday, I know (2) of your Kids that were at my back kitchen door that day were Rookies at that time, maybe 18 months out if the academy. The amount of gunfire, (42) rounds, fired from outside of our home into our back kitchen door clearly shows that.

### First Cause of Action: 42 U.S.C. § 1983 – Excessive Deadly Force in violation of the Fourth and Fourteenth Amendments against the individual Defendants, in their individual capacities

77.    Plaintiff incorporates by reference all the allegations contained in the previous paragraphs.

78.    Defendant's McQuaid, Vincent, Cremeans, Johnston, Hinchman, Rodgers, Siebel, White, Render, Parsons, McFann, and Neil executed an illegal No Knock Raid that Failed.

79.    Defendant's McQuaid, Vincent, Cremeans, Johnston, Hinchman, Rodgers, Siebel, White, Render, Parsons, McFann, and Neil, Never knocked, Never Announced and Never stated their purpose for being there.

80.    Defendant's McQuaid, Vincent, Cremeans, Johnston, Hinchman, Rodgers, Siebel, White, Render, Parsons, McFann, and Neil while outside the residence. Open fire on the unarmed Pinkerman Family, Firing (42) rounds. Wounding both Michael Sr. and Michael Jr

81.    Plaintiff's were inside their own home at the time they were shot and due to the damage done to the door by D# 14 Cpl.James Johnston were not able to comply with their illegal demands and illegal method of entry.

82.    Michael Jr. was shot, it's unknown how many times. This is the first shooting that happened at the back kitchen door. Michael Jr. fled the room as he was being shot. The 2nd shooting happened in the forced entry at the side dining room door, where Michael Jr. Received his fatal shots. Michael Sr. was shot (4) times and Laura Pinkerman narrowly escaped being shot due to Michael Sr. pushing her out of harms way.

83.    4 1/2 minutes later the side dining room door is breached and there is more gunfire. This is the 2nd shooting where Michael L. Pinkerman Jr. is gunned down while standing at his bedroom door. Our only son is no longer with us.

84.    Defendant's McQuaid, Vincent, Cremeans, Johnston, Hinchman, Rodgers, Siebel, White, Render, Parsons, McFann, and Neil's actions were objectively unreasonable, unlawful, unwarranted, and in violation of the Plaintiff"s clearly established procedural and substantive rights, including the 4th Amendment of the United States Constitution.

85.    Defendant's McQuaid, Vincent, Cremeans, Johnston, Hinchman, Rodgers, Siebel, White, Render, Parsons, Stevens, McFann, and Neil's actions were willful, wanton, intentional, malicious and done with a callous and reckless disregard for the Plaintiff"s 4th Amendment right to be free from excessive force.

86.    Plaintiff's suffered harm, including personal injuries, extreme emotional distress, medical expenses, severe pain, and continues to suffer damages, and is entitled to recover damages for the same.

**Second Cause of Action: 42 U.S.C. § 1983 – Unlawful search and seizure in violation of the Fourth and Fourteenth Amendments against the individual Defendants, in their individual capacities**

87.    Plaintiff incorporates by reference all the allegations contained in the previous

27

paragraphs.

88.     At all times relevant to the allegations in this Complaint, the individual Defendants acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers, sergeants, and lieutenants of the CCSD.

89.     Under the Fourth and Fourteenth Amendments the Pinkerman Family had a clearly established constitutional right to be secure against unreasonable and unlawful searches.

90.     As described in the preceding paragraphs, the individual Defendants' actions toward The Pinkerman Family violated their clearly established constitutional rights, including those under the Fourth and Fourteenth Amendments of the United States Constitution. Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time Michael Sr. was shot and Michael Jr's death.

91.     In the manner described in this Complaint, the CCSD Defendants, acting under color of law, violated the Pinkerman's constitutional rights, causing them damage. Specifically, Defendant Jared Cremeans illegally and unreasonably obtained a search warrant for 4036 Blue Sulphur Rd. with the absence of probable cause or reasonable suspicion in violation of the Fourth Amendment of the United States Constitution.

92.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful and deliberate indifference to the Pinkerman's constitutional rights. Specifically, as described in this complaint, the search warrant contained deliberate falsehoods and without that dishonesty included, the judge would not have issued the warrant. In addition, each of the CCSD deputies knew that search warrant was unreasonable and not authorized prior to the attack on 4036 Blue Sulphur Rd. and after.

28

93.     Defendants are also liable based on their failure to intervene to prevent the

CCSD Defendants from violating the Pinkerman's constitutional rights.

94.     In addition, Defendants made the agreements and planned to obtain these illegal

search warrants and Criminal Complaints, via perjury. Specifically, as part of this agreement, the

CCSD, Lt. Adkins, and Lt. Enochs II, agreed and knew that members of the CCSD, including

Dfc. Jared Cremeans, Cpl. T.S. Blatt and Sgt. R.H. McQuaid would obtain illegal search

warrants and Criminal Complaints in violation of the Fourth and Fourteenth Amendments.

Each members of the conspiracy agreed to the plan and intended to further its purpose. As a

result of this scheme, Defendants violated the Pinkerman's constitutional rights.

95.     In addition, Lt. Adkins and Lt. Enochs II possessed supervisory authority over the

CCSD Deputies. At all relevant times, Lt. Adkins and Lt. Enochs II had a legal duty to

adequately supervise the CCSD. Ignoring this duty, Lt. Adkins and Lt. Enochs II failed to

properly direct the conduct of their subordinates, failing to enforce proscriptions against the use

of illegal searches and criminal complaints , or failing to intervene to stop their subordinates' use

of illegal searches and criminal complaints, despite actual or constructive knowledge that the

CCSD deputies presented an excessive risk of harm to the Pinkerman Family.

96.     Defendants' unreasonable and unlawful search or failure to intervene to prevent the

unlawful search caused the Pinkerman's to be unlawfully searched and seized and thereby

caused Michael Sr. Injuries and the death of our only son Michael Jr's. As a direct and proximate

result of the violation of their constitutional rights by Defendants, the Pinkerman's suffered

general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C.

§1983, 1988.

97.    Plaintiff's are entitled to exemplary damages because the individual Defendants'
actions were motivated by malice and/or involved reckless or callous indifference to the
Pinkerman's federally protected rights, and they engaged in these actions and omissions
intentionally, willfully, or wantonly, demonstrating deliberate indifference to, and a reckless
disregard for the Pinkerman's constitutionally protected rights.

### Third Cause of Action: - Invasion of Privacy

98.    Violations of rights under the United States Constitution and for negligence and
invasion of privacy pursuant to West Virginia Law. This Court has subject matter jurisdiction
pursuant to 28 U.S.C. sections 1331 and 1343.

99.    Within minutes of our son's death, Deputies took and Shared Unnecessary Photos on
their personal cell phones of Michael Pinkerman Jr's. deceased body as he lay on his bedroom
floor. Many of which had no conceivable investigatory purpose and were focused directly on the
victims' body.

100.    Cabell County Sheriff and WV State Police employees "showed death scene photos to
other government personnel and to their friends. But to find out that the conduct of its employees
who took and shared photographs of Plaintiffs' deceased loved one. Photos of our dead son were
taken as he lay in his bedroom floor and improperly shared, shared by Cabell County Sheriff's
Deputies, WVSP G.N. Losh, the Assistant Director of the CCERC Dan Marcum and their
Friends after his death.

101.    The Sheriff's deputies, Fire Department, WV State Police F/Sgt. G.N. Losh and the
CCERC Dan Marcum's outrageous actions have caused Mr. And Mrs. Pinkerman severe
emotional distress, compounded by the trauma and tragic way of losing their only son Michael.

102.     It's hard to imagine the thought that sheriff's deputies, firefighters, and members of the public have gawked at gratuitous images of their deceased son, living in fear that they or other family members, will one day see horrific images of their loved one online.

103.     But the biggest threat to the sanctity of the victims' body proved to be the WVSP and the Sheriff's Department themselves. Faced with a scene of unimaginable loss, Allowed personnel abused their access to the crime scene and allowed Deputies not involved, that felt the need to take turns and come to the crime scene.

104.     Within forty-eight hours, at least ten members of the Department obtained and possessed images of Michel Jr. on their personal cell phones without any legitimate reason for having them. The gratuitous images also became a subject of gossip within the Department, as deputies shared them in settings that had nothing to do with investigating the accident. One deputy even showed off photos of Michael's body at a bar, stating "This guy was coming towards us all covered in blood." As if bragging about it like a hunter would showing a picture of a deer he killed while hunting.

105.     The Sheriff's deputies, Fire Department, WV State Police F/Sgt. G.N. Losh and the CCERC Dan Marcum's outrageous actions have caused Mr. And Mrs. Pinkerman severe emotional distress, compounded by the trauma of losing their only son Michael. It's hard to imagine the thought that sheriff's deputies, firefighters, and members of the public have gawked at gratuitous images of their deceased son, living in fear that they or other family members, will one day see horrific images of their loved one online.

106.     In taking these photographs and sharing them their employees' conduct has demonstrated that they either do not understand or do not care about the pain they have caused.

31

This lawsuit seeks to impose accountability and demand for that.accountability for Defendants'
disrespect of the dead and callous intrusion upon their private grief."

### Forth Cause of Action:42 U.S.C. § 1983 Defendants Cabell County Commission and Cabell County Sheriff Charles Zerkle

107.     This is a cause of action for violation of civil rights under 42 U.S.C. § 1983 against
the Defendants, Sheriff Zerkle and Cabell County Commission.

108.     The Plaintiff re-alleges the allegations contained in paragraphs above, as if fully set
forth herein.

109.     On October 30, 2019, the Defendant Sheriff Zerkle and the Defendant Cabell County
Commission through its employees and agents, acting in the course and scope of their duties,
deprived the Plaintiff 's the Pinkerman Family of their rights under the United States
Constitution in violation of 42 U.S.C. § 1983, in that the Plaintiff's the Pinkerman Family was
A victim of a Deadly No Knock Raid, illegally Shot, detained, battered, and restrained causing
the wounding of Michael L. Pinkerman Sr. and the death of their only son, Michael Jr.

110.     The Defendants, Sheriff Zerkle and Cabell County Commission through its employees
and agents acting in the course and scope of their duties, took the actions complained of above
with knowledge that the actions were in direct violation of the United States Constitution
and the rights of the Pinkerman Family. The acts of the Defendants, violated the constitutional
rights of the Plaintiff's.

111.     The Defendants, Sheriff Zerkle and Cabell County Commission are responsible for the
acts of its deputies.

112.     The Defendants, Sheriff Zerkle and Cabell County Commission had a custom, policy

and practice in place that allowed his police officers to use excessive force on citizens without proper legal jurisdiction.

113.    The Defendants Sheriff Zerkle and Cabell County Commission had a custom policy and practice in place that allowed his Deputies to do No Knock Raids, without knocking on doors and without announcing their law enforcement status thereby causing a danger to the officers and to the citizens of Cabell County.

114.    Further, it is Defendants Sheriff Zerkle and Cabell County Commission custom to apply force in such a way that it maximizes injury to the citizen, when in all reasonable circumstances, lesser application of force using the same technique would satisfy the objective and yield less or no injury.

115.    The actions of the Defendant's the CCSD Deputies was done under the color of law pursuant to the official policy, customs and practice of the Defendants Sheriff Zerkle and Cabell County Commission

116.    The Defendants Sheriff Zerkle and Cabell County Commission policies, customs, and procedures, or lack thereof, were the driving force causing the Defendant's CCSD Deputies to act as described herein including to use unnecessary force, and to restrain and injure.

117.    The Defendants Sheriff Zerkle and Cabell County Commission approved and/or ratified the unlawful and deliberate conduct of the Defendant's CCSD Deputies

118.    As a direct result of the Defendants Sheriff Zerkle and Cabell County Commission, policies, customs, and procedures, the Plaintiff's Michael Sr. was shot and wounded, and the death of their only son, Michael Jr.

119.    Plaintiffs are informed and believe that the Defendants Sheriff Zerkle and Cabell

33

County Commission maintained customs, policies, and/or practices whereby Cabell County Sheriff's Officers were encouraged, authorized and/or permitted to engage in repeated civil rights violations such as undertaking unreasonable searches and seizures, preparing and filing false police reports, and subjecting innocent citizens to unlawful shootings and excessive force.

120.    The Defendants Sheriff Zerkle and Cabell County Commission maintained customs, policies, and/or practices whereby they failed to fully and/or fairly investigate alleged police misconduct so that appropriate and timely disciplinary action and/or training could be taken regarding officers shown to have utilized excessive force and the defendants failed to properly remove or terminate officers who violated the rights of citizens or engage in the types of misconduct alleged herein.

121.    The incident described herein was caused by the deliberate indifference of the Defendants Sheriff Zerkle and Cabell County Commission, or other high-ranking Sheriff Department officials with regard to the need for more or different training regarding use of force, as well as disciplining of the police officers.

122.    Plaintiffs are further informed and believe and there fore allege that the damages sustained as alleged herein were the direct and proximate result of the Defendants Zerkle and Cabell County Commission customs and/or policies and deliberate indifference in the training, retraining, supervision and/or discipline of members of the Cabell County Sheriff's Department, including the Defendant's CCSD Deputies. The actions of the Defendant's CCSD Deputies conformed to official policy, custom or practice of the Defendants Sheriff Zerkle and Cabell County Commission.

123.    The aforementioned customs, policies or practices of the Defendants Sheriff Zerkle

and Cabell County Commission resulted in the deprivation of the Plaintiff's Constitution rights.

124.    As a result of the Defendants Zerkle and Cabell County Commission failure to provide officers with standard operating procedures governing their conduct, and as a result of failing to demonstrate to them accountability for violations of proper police procedure, including procedures pertaining to their lawful authority, the use of force and proper use of firearms, individual officers, and particularly the Defendant's CCSD Deputies believed that their actions would not be properly monitored by supervisory officers and that any misconduct he committed would not be investigated or sanctioned, but instead would be tolerated and ratified without any accountability, which is what ultimately occurred regarding the shooting and wounding of Michael Sr. and the death of their only son, Michael Jr.

125.    The Defendant's CCSD Deputies and Cabell County Commission had a custom, policy and/or practice of deliberately failing to perform adequate internal affairs investigations of officer involved shootings and excessive use of force and then internally exonerating the involved officers so that the individual officers, including the Defendant's CCSD Deputies believed that their actions would not be properly monitored and that any misconduct would not be investigated or sanctioned, but instead would be tolerated and ratified without any accountability. Included in this custom, policy and/or practice is the failure to investigate and prepare an internal affairs report with findings, conclusions and recommendations regarding officer involved shootings and the failure to require officers to submit use of force reports following officer involved shootings. These practices directly caused the misconduct of Defendant's CCSD Deputies complained of herein.

## **Fifth Cause of Action: - Negligence and Gross Negligence**
### **(As to all Defendants)**

126.    The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this Complaint as if fully set forth herein that are not inconsistent herewith.

127.    The defendants all departed from the duties of care required by law enforcement officers, employees, and the employing defendants that hire, train and employ these officers and other employees and were thereby negligent, careless, grossly negligent, reckless and acted in violation of the duties owed to the plaintiffs in that they committed one or more of the following acts or omissions, any or all of which were departures from the prevailing duties of care:

    a.    In failing to ensure the safety, security, freedom and well-being of the plaintiffs;

    b.    In failing to adhere to proper procedures, including but not limited to failing to ensure there was sufficient cause to shoot somebody through a door inside their home, identifying themselves as law enforcement when serving a 10-100 A misdemeanor Search Warrant.

    c.    In failing to use discretion before and during the shooting and consider other methods using less force.

    d.    In reporting, or causing to be reported, materially false information, and failing to correct that information;

    e.    In failing to make apparent observations that the shooting happened through a door rather than an open front door;

    f.    In shooting blindly into a home;

    g.    In shooting into a home while fully covered and protected;

    h.    In writing and/or filing false law enforcement report(s)

i.    In approving false law enforcement report(s);

j.    In communicating to investigators and others the false narrative described above;

k.    In publishing or causing to be published the false narrative described above;

l.    In acquiescing and refusing to come forward with evidence and information that would incriminate Dfc. Jared Cremeans;

m.    In acquiescing and refusing to come forward to correct the false narrative concerning Mr. Pinkerman and

n.    Other such acts and omissions that discovery reveals.

128.    As a direct and proximate result, Mr. and Mrs. Pinkerman were injured and are entitled to damages, including legally presumed and special damages, in addition to actual, compensatory, general, and nominal damages. The special damages include, but are not limited to, medical expenses and other physician expenses and repair and replacement to damaged property, including Mr. and Mrs. Pinkerman's home. Mr. Pinkerman suffered physical harm, and is forced to incur medical treatment and bills, both in the past and in the future as well. Both Mr. and Mrs. Pinkerman suffered emotional harm, and mental shock and suffering. They both have and have suffered severe and extreme emotional distress, anxiety, and grief, and other harms and losses due to the witnessing of their only son Michael L. Pinkerman Jr. Their injuries include, but are not limited to, physical injury, pain and suffering, emotional and mental distress, and medical expenses, that will continue into the future.

## **Sixth Cause of Action: Supervisory Negligence**

### **Against Lt. Michael Adkins and Lt. Dale Enochs II and unnamed Individual - capacity Defendants**

129.    Plaintiff incorporates the preceding numbered paragraphs by reference.

130.    Defendants D# 8 Lt. Michael Adkins and D# 9 Lt. Dale Enochs II, or unnamed

Individual   capacity defendants had a ministerial duty to train and supervise McQuaid, Vincent,

Cremeans, Johnston, Hinchman, Rodgers, Siebel, White, Render, Parsons, Stevens, McFann, and

Neil or unnamed individualcapacity defendants.

131.    Defendants Lt. Adkins and Lt. Enochs II or unnamed individual capacity defendants

breached those duties.

132.    Defendants' breach of the duties caused harm to Plaintiff.

133.    As a result, Plaintiff is entitled to compensatory damages for the trauma, humiliation,

indignity, physical pain, mental suffering, or mental anguish he suffered, including the negligent

infliction of severe emotional distress as a result of witnessing the shooting and death of our only

son, Michael L.Pinkerman Jr.

134.    Plaintiff is also entitled to punitive damages for gross negligence.

## Seventh Cause of Action

### Negligent and Gross Negligent Hiring, Supervision, Training, and Retention
### (As to Employing Defendants)

135.    The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this

Complaint as if fully set forth herein that are not inconsistent herewith.

136.    Employing defendants each had a duty to hire competent and fit employees to perform

background checks, to require appropriate education, experience, and other qualifications, to

properly train employees, to properly supervise employees, and to terminate unfit employees.

137.    The defendants breached their duties to adequately hire, supervise, train, and retain

employees and acted in a negligent and grossly negligent and reckless manner as follows:

        a.    In failing to ensure that employees complied with procedures regarding the

38

incidents such as those described herein;

b.  In failing to ensure that employees complied with procedures regarding responding to a home, including identification of themselves as law enforcement;

c.  In failing to ensure that employees identified and utilized proper communication, for the situation at hand;

d.  In failing to ensure that employees correctly understood the difference between a Knock and Announce Search Warrant and a No Knock Raid.

e.  In failing to ensure that employees accurately reported and communicated information and did so in a forthcoming manner;

f.  In failing to terminate employees who were unfit for their position;

g.  In failing to train law enforcement officers to identify themselves as law enforcement and/or make it apparent to homeowners that they are law enforcement officers when serving a 10-100 misdemeanor search warrant; and in other such ways that discovery reveals.

## **Eight Cause of Action: DAMAGES**

138.    As a direct and proximate result, Michael Sr. and Laura Pinkerman were injured and are entitled to damages, including legally presumed and special damages, in addition to actual, compensatory, general, and nominal damages. The special damages include, but are not limited to, medical expenses and other physician expenses and repair and replacement to damaged property, including Michael Sr. and Laura Pinkerman's home.

139.    Michael Sr. suffered physical harm and injuries. His injuries include, but are not limited to, physical injury, disability, pain and suffering, emotional and mental distress. Being

39

shot multiple times in his hip, while in his own home. Then to be brutally attacked and forced to

endure pain inflicted by Deputy Nate Rodgers, forced to wear handcuffs that were to tight.

Requesting multiple times for Deputy Hunter Neil to loosen them just a little. Only to fall on

deaf ears. Michael Sr. now has Nerve damage, pain in his wrist and is forced to incur medical

treatment and bills, both in the past and in the future as well.

140.    Both Michael Sr. and Laura Pinkerman have suffered emotional harm, and mental shock

and suffering. They both have suffered severe and extreme emotional distress, anxiety, grief, and

other unimaginable devastation due to witnessing the brutal murder of their only son, Michael.

141.     Being held at gunpoint not being able to go to him and help him. Thinking the

Deputies would get help for him only to realize they weren't interested in helping him. They

pursued him to finish him off.

142.    Coping with the death of our son, Michael Jr. the loss of having that relationship and

companionship with us as a family, he was our enjoyment in life, then dealing with the

reputational harm caused by Defendants' false narrative and smear campaign of our character.

To cover up their brutal destruction of a family.

143.    There was no respect here. Our home was pilfered and ransacked. Our Safes were

Illegally opened and pilfered. We had money and items stolen from us and fear it won't be

returned. I have never received a property receipt with them listed on it so I will make a note of it

here. We have a large sum of money missing $18,500.00. and a large bottle of Valium pills.

Papaw got the pills from his sister and was taking them. Stayed in a comatose state, I found

them, took them away from him. Put them in the safe because of the kind of pills they were, then

forgot about them. These items were kept inside of a smaller safe, inside of our big Living room

Champion Safe. We kept it in there for double protection in case of a fire. The key stayed in it.
When our seized items were returned. The back of this small safe was cut open and the key was
missing. The other missing items were Michael Jr's big Trauma Bag, 6 clear 9mm high capacity
magazines, a pair of handcuffs, a tactical fighting dagger, a Motorola hand held radio with Mic.
The Blue Lives Matter license plate that was on the front of Michael's vehicle and 2 WVSP
support Stickers, taken off the inside windshield of both our vehicles.

144.    Our home might be considered a dump to someone else but it was our palace, a place to
be safe and secure, a place to build memories. But it's all gone now. There is nothing but
heartache and sadness here. Too old to start over and the way this world is who would want to.
Our Joy is gone, there is no Future, no grandchildren to look forward too.

## Prayer For Relief

145.    WHEREFORE, the plaintiff's respectfully pray for judgment against the defendants
and for damages as stated herein, including compensatory, general, actual, special, nominal and
punitive damages, plus pre and post judgment interest, in an amount to be determined by a jury
at the trial of this action as well as attorneys' fees and costs if applicable and any interest
made on the $300,000 Cash Only Bond that was paid by The Hermitage of the Holy Cross
Monastery due to the knowingly fraudulent charges brought against Michael L. Pinkerman Sr.
And finally for such other and further relief as this Court deems just and proper.

THE PLAINTIFFS HEREBY DEMAND A JURY TRIAL FOR ALL CLAIMS SO TRIABLE HEREIN

This 27th day of October, 2021                    Respectfully submitted,

Huntington, West Virginia

Michael L. Pinkerman Sr.

Laura J. Pinkerman
4036 Blue sulphur Road
Ona, West Virginia 25545
        304-617-3225
Janiebutton57@gmail.com

STATE OF WEST VIRGINIA
COUNTY OF CABELL

I, _Pamela G Fulton_ a notary public in and for said state, do hereby

certify that Michael L. Pinkerman Sr. and Laura J. Pinkerman, whose name is signed in the

writing above, has this day acknowledged the same before me.

Given under my hand this 27th day of October, 2021

My commission expires _Jan 23, 2024_

Notary Public

OFFICIAL SEAL
Notary Public, State of West Virginia
PAMELA G FULTON
BB&T
5638 US Rt 60 E
Huntington, WV 25705
My Commission Expires Jan. 23, 2024